**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

**Susan Robar**

      **v.**　　　　　　　　　　　　Civil No. 10-cv-288-PB
　　　　　　　　　　　　　　　　Opinion No. 2011 DNH 110
**Michael Astrue, Commissioner,
Social Security Administration**

**MEMORANDUM AND ORDER**

      Susan Robar filed a complaint seeking review, pursuant to 28 U.S.C. § 405(g), of the Commissioner's decision denying her application for disability insurance benefits.  Robar moves to reverse the Commissioner's decision on the grounds that the residual functional capacity assessment by the Administrative Law Judge ("ALJ") is not supported by substantial evidence and that the ALJ erred in not giving Robar's treating source opinions appropriate weight.  The Commissioner moves to affirm the decision.  For the reasons provided below, I affirm the Commissioner's decision.

**I.   BACKGROUND**[1]

      Susan Robar was born in 1967 and was forty years old when she applied for disability insurance benefits.  She is a high school

---

[1] The background information is taken from the parties' Joint Statement of Material Facts.  See L.R. 9.1(b).  Citations to the Administrative Transcript are indicated by "Tr."

graduate, and she also earned an Associate's Degree in college. Before she stopped working in March 2007, she was an adolescent counselor/caseworker, working at night in a residential facility, the Dover Children's Home.   Prior to that, Robar had worked as a police and fire dispatcher, a salesperson, a sandwich maker, and a security officer.

## A.    Medical and Psychological Treatment Records

Robar was first diagnosed with Crohn's disease in 1988.   By 1996, medical records indicate that she was asymptomatic and not taking medication for Crohn's disease.

In November of 2003, Robar's medical records at Womankind Counseling Center note that she had been on medication to treat depression for two and a half years.   At that time, her depression was "healing," and she was feeling good more consistently.   In the spring of 2004, Robar lost her job as a dispatcher, experienced some depression, recovered, and started working at Dover Children's Home as an adolescent counselor and caseworker.   She again had an episode of feeling tearful, anxious, and irritable, but a month later she felt better.   That fall, she again experienced depression but felt better by December.   During 2005, Robar took medication for depression and her depression, grief, anxiety, and stress improved,

causing her GAF score to be assessed at 55.[2]

While playing hockey in January of 2006, Robar noticed that she was having shortness of breath, but subsequent pulmonary testing showed normal lung function.  She was examined by a chiropractor in February 2006 because of stiffness in her back and neck after an automobile accident.  The chiropractor found a reduced range of motion in her cervical spine and diagnosed cervical strain or sprain. By June 2006, Robar no longer was having spasms in her back or neck.

Also in January 2006, Robar was evaluated by her gastroenterologist, Dr. Alain Ades, for her Crohn's disease.  Robar reported increased diarrhea with some bleeding.  Dr. Ades thought that Robar was having a mild recurrence of Crohn's disease.  He recommended Remicaid infusions to treat that condition and "her Althialgias, which are severe."[3]  On May 18, 2006, a physician's assistant who completed a "Child-Care Person Health Care Form," wrote that Robar's physical and mental health issues were well controlled by her medications.

_____

[2] "GAF" stands for the Global Assessment Functioning scale. See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 30 (4th ed. 1994).

[3] The parties' Joint Statement of Material Facts does not explain "Remicaid infusions," or "Althialgias."  Remicaid is also spelled "Remicade" in the Statement and the administrative record.  Based on Dr. Ades note in the Administrative Record, "Althialgias" should have been "arthralgias," which generally means joint pain.

Robar met about once a month beginning in 2006 with Jeanne Allen, a licensed social worker.  In June of 2006, Allen referred Robar to Dr. Amy Feitelson, a staff psychiatrist at Seacoast Mental Health Center.  Dr. Feitelson noted that Robar said she had been in intermittent treatment for depression since college and that her mood fluctuated depending on stress within her family.  Dr. Feitelson reported that Robar was cooperative during the evaluation, that her mood was anxious and depressed, and that her affect was constricted. Dr. Feitelson diagnosed dysthemia and noted that bipolar type II, attention deficit hyperactivity disorder, personality disorder, and learning disabilities would need to be ruled out.  She rated Robar's GAF at 65.[4]

Also in June 2006, Robar had an appointment with Dr. Sonita Estrada, who had been treating Robar for inflammatory arthritis related to Crohn's disease.  Dr. Estrada noted that Robar's prior treatment had either caused problems with her Crohn's disease or had not helped her arthritis.  Dr. Estrada decided to start a new

---

[4] "'A GAF score of 65 . . . reflects "some mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships."'" Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (quoting Kohler v. Astrue, 546 F.3d 260, 263 (2d Cir. 2008) quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000)); see also Barton v. Astrue, No. 10-cv-151-PB, 2011 WL 2412955, at *1 n.3 (D.N.H. June 14, 2011).

medication.   By August 2006, Robar also had changed her medication for depression to Wellbutrin.

Robar had an appointment with Dr. Ades on August 10, 2006. Dr. Ades thought that Robar was having a flare up of Crohn's disease and advised her to discontinue Wellbutrin.   Robar was taking Remicaid and a short-term course of Prednisone.   In October of 2006, Robar reported doing better and decreasing her Prednisone dose.   By December 2006, Dr. Ades reported that Robar was better but still had symptoms that he believed were due to stress.

In January 2007, Dr. Feitelson noted that Robar's mood was fairly stable although she had depression on some days.   Robar reported that she was working and was able to play hockey, which she enjoyed. Dr. Feitelson increased Robar's medication in March 2007 because she was having difficulty with attention, focus, and energy.

Robar also saw her primary care physician, Dr. Kathleen Kelley, in March 2007.   Robar reported that she was having cognitive difficulty, including lack of concentration, memory loss, possible blackouts, and fatigue that was out of proportion to the amount of sleep she was getting.   Dr. Kelley noted Robar's various chronic problems and that she was applying for medical leave from her work. Dr. Kelley noted that Robar had chronic Crohn's disease, fatigue, malaise, and insomnia and referred her for neuropsychological testing

and an MRI.[5]

Also in March 2007, Robar told her social worker, Jeanne Allen, that she felt out of control both physically and emotionally.  Robar continued to meet with Allen for therapy through 2009.  During 2009, Robar reported low energy, "struggling to get through the day," attention problems, memory problems, and fatigue.

Beginning on March 29, 2007, Dr. Gina M. Divenuti, an oncologist/hemotologist, treated Robar for anemia.  Dr. Divenuti found that Robar was mildly anemic, which she thought was because of the effects of Crohn's disease.  On May 24, 2007, after Robar had received several iron infusions, Dr. Divenuti found that Robar had attained desirable blood levels.  Robar later returned to Dr. Divenuti and continued to have iron infusions through 2009.

Craig Stenslie, Ph.D., did a psychological evaluation of Robar on May 10, 2007.  Dr. Stenslie found that Robar had a mild cognitive impairment in auditory attention and working memory, verbal learning and word initiation and organization, psychomotor speed, and cognitive flexibility.  He also found "signs of dysthemic disorder, generalized anxiety disorder that had potential under stress to

---

[5] The Joint Statement of Material Facts does not indicate whether that testing was done.  In her motion, Robar states that she was referred to Dr. Craig Stenslie who did the neuropsychological testing.

become a mild dissociative disorder, and a mild to moderate personality disorder with avoidant and mildly paranoid and/or schizoid features." Joint Statement at 8 (Doc. No. 10). Dr. Stenslie concluded that Robar's cognitive problems were related to anxiety, depression, and fatigue. He recommended that instead of working at night, a more normal daytime schedule would have positive effects.

Dr. Kelley referred Robar to Daniel Kunz, D.O., a rheumatologist, who met with Robar on September 5, 2007. Robar complained of pain that had been worsening. Dr. Kunz thought Robar's pain was related to Crohn's disease. He recommended retreatment with Remicaid for her Crohn's disease and also ordered x-rays of her sacroiliac joints. By December of 2007, Robar reported improvement with Remicaid treatment and rest. Dr. Kunz prescribed medication for remaining pain issues. On June 2, 2008, Robar was still having hand, knee, and back pain, along with morning stiffness. In January 2009, Dr. Kunz noted that Robar would be undergoing an MRI and would have follow up with an orthopedic surgeon.

On November 10, 2008, Robar met with Dr. Karen Lauze, a neurologist.[6] Dr. Lauze noted that Robar's seizures and migraine

---

[6] Although the ALJ relied on Dr. Lauze's notes in reaching his decision, the parties did not include a summary of the notes in the Joint Statement of Material Facts.

headaches were under control and cleared her to drive and to work. Dr. Lauze wrote: "No contraindications to employment." (Tr. 847). She indicated that Robar should have a follow up appointment in a year.

Robar was evaluated by Dr. Roger B. Nowak, an orthopedic surgeon, on February 20, 2009.  Robar explained that she had experienced left shoulder pain while riding and trying to control her horse.  After examination, Dr. Nowak recommended surgery on her left shoulder to repair a rotator cuff injury and that surgery was performed on March 24, 2009.

Robar continued to have appointments with Dr. Ades.  In April of 2009, Robar reported that she had no Crohn's disease symptoms. Dr. Ades decided that Robar could delay the next Remicaid treatment. He recommended that she return in four months.

Robar consulted with Dr. Daniel A. Nadeau, an endocrinologist, in May 2009.  She complained of a high pulse and blood pressure every four to six weeks and dizziness when standing.  Dr. Nadeau noted that Robar had chronic problems with hypothyroidism and depression, which he thought were not well controlled, and a neoplasm adrenal issue.

Robar saw another orthopedic surgeon, Dr. Mark Reeder, on November 5, 2009, for chronic elbow pain.  Dr. Reeder noted that Robar's pain had become worse after she started coaching ice hockey.  Dr. Reeder recommended physical therapy.  At appointments over the next several months, Dr. Reeder found that Robar's symptoms were improving.

**B.   Evaluations Done for Purposes of Robar's Benefits Application**

Michael Schneider, Psy.D., a state agency consultant, reviewed Robar's medical and psychological treatment records in July 2007 and completed a psychiatric review technique form and a mental functional capacity assessment.  Based on his review, Dr. Schneider found that Robar had depression, an anxiety disorder, and a personality disorder that caused mild to moderate restrictions in Robar's activities and functioning.  He found no extended episodes of decompensation.  Dr. Schneider concluded that although Robar had a severe psychological impairment, she was able to understand, remember, and carry out simple instructions and could maintain a normal work week.  He also concluded that Robar could work with others in an environment that did not require frequent interaction with the public or overly critical supervision.

Dr. Hugh Fairley, also a state agency consultant, reviewed Robar's medical records and completed an assessment of her physical

residual functional capacity in July 2007.  He noted that Robar had
Crohn's disease, anemia, arthritis, migraines, and asthma.  As a
result, he concluded that Robar was limited to lifting and carrying
up to twenty pounds occasionally and ten pounds frequently and that
she could sit, stand, or walk with normal breaks for up to six hours
in an eight-hour workday.  Dr. Fairley found no manipulative, visual,
or communicative limitations but found that Robar was limited to
doing some postural activities only occasionally.  He also found
some environment limitations.

Dr. Feitelson completed a mental impairment questionnaire for
Robar on February 4, 2010.  She diagnosed a single episode major
depressive disorder and a dysthemic disorder and assigned a GAF score
of 65.  Dr. Feitelson wrote that Robar could understand, remember,
and carry out simple instructions but not detailed instructions and
that she could not deal with the competitive requirements of
semi-skilled or skilled work.  Although she found some limitations
in goal setting, interacting with the public, appearance, and
traveling, Dr. Feitelson concluded Robar's abilities were
satisfactory and that her mental condition caused only moderate
difficulty in activities of daily living and social functioning.
Dr. Feitelson, however, found that Robar had marked difficulty in
maintaining concentration, persistence, and pace and had experienced

10

one or two episodes of decompensation.

Robar's social worker, Jeanne Allen, also completed a mental impairment questionnaire for Robar on February 9, 2010.  Allen assigned a GAF score of 50.[7]  Allen said that Robar had many additional symptoms that Dr. Feitelson had not included in the questionnaire and that Robar would be unable to meet competitive standards for remembering work procedures; understanding, remembering, and carrying out even very short and simple instructions; maintaining attention; maintaining attendance and punctuality, and performing at a consistent pace.  Despite her limitations, Allen believed that Robar had satisfactory ability to do certain activities such as sustain a routine, work in coordination with others, accept instruction and respond appropriately to criticism, and get along with co-workers.  Allen stated, however, that Robar's ability to deal with unskilled work was seriously limited but not precluded.  Allen found that Robar's mental condition caused marked difficulty in activities of daily living, social functioning, and maintaining concentration, persistence, and pace.

Dr. Kelly completed a physical residual functional capacity questionnaire also in February 2010.  Dr. Kelly indicated on the

_____

[7] A GAF score between 45 and 50 "indicat[es] serious symptoms or serious impairment in functioning . . . ."  <u>Campbell v. Astrue</u>, 627 F.3d 299, 303 (7th Cir. 2010).

form that Robar could only stand or walk for less than two hours
and sit for about two hours in an eight-hour day and would need to
change between sitting and standing at will.   She also wrote that
Robar could lift ten pounds occasionally and twenty pounds rarely
and could use her hands, fingers, or arms for only twenty-five percent
of a workday.   Dr. Kelley also wrote that Robar would be likely to
miss more than four days of work per month.

## II.  **PROCEDURAL HISTORY**

Robar applied for disability insurance benefits on May 2, 2007,
alleging disability beginning on March 8, 2007.   After her
application was denied at the initial level and on review, Robar
requested a hearing before an ALJ.

## A.  **Hearing**

A hearing was held on February 11, 2010.   Robar was represented
by counsel and testified at the hearing.   She described her previous
work at the Dover Children's home and explained that her Crohn's
disease was active at the end of the time she worked there.   She
said that at the time of the hearing, her Crohn's disease had been
fairly under control for a while and that she had been an assistant
hockey coach for a team of young girls since September 2009.

Robar testified that she could not work at a sedentary job because of stiffness that caused back and neck pain and arthritis in her hands and fingers.   She also said that she experienced fatigue and drowsiness caused by some of her medications.   She said that she had some depression about not being able to do her former work. She also said that her epilepsy was under control with medication. She was then living with her parents and her brother's family and was able to do some housework.

A vocational expert also testified at the hearing.   The vocational expert explained the skill levels and exertional requirements of Robar's previous jobs.   In response to a hypothetical question by the ALJ, the vocational expert testified that someone with Robar's age, education, and work experience, who was limited to unskilled light work, able to stand or walk for six hours in an eight-hour day, and had other postural and environmental limitations could do Robar's previous work as a sandwich maker but not any of her other previous jobs.   The vocational expert testified that Robar's limitations would cause only minimal erosion of the light work base so that there would be a significant number of light work jobs available.   He further testified that a change to sedentary jobs would preclude all of Robar's past work but that unskilled sedentary jobs existed that she could do.

13

B.   **ALJ's Decision**

The ALJ issued a decision on February 26, 2010, denying Robar's application for disability insurance benefits.   In making the decision, the ALJ found that Robar had severe impairments of Crohn's disease, seizure disorder, depression, anxiety, personality disorder, status post rotator cuff repair, anemia, and asthma. Despite her impairments, the ALJ concluded that Robar retained the residual functional capacity to perform light work with limitations to only occasionally climb ramps or stairs and never to climb ladders, ropes, or scaffolds.   The ALJ also found that Robar could occasionally balance, stoop, kneel, crouch, or crawl and that she should avoid certain environmental conditions such as extreme temperatures and air contaminants.   In addition, the ALJ found that Robar was limited to work that involved remembering and carrying out only simple instructions but that she could adapt to routine workplace changes.

Based on Robar's residual functional capacity and the testimony of the vocational expert, the ALJ found that Robar was capable of returning to her work as a sandwich maker, that the Medical–Vocational Rules would support a finding that she was not disabled, and, alternatively, that other jobs existed in significant numbers that Robar could do.   The ALJ's decision became the final decision of the

14

Commissioner when the Decision Review Board failed to complete its review within the time allowed.

### III.   **STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the transcript of the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  Review is limited to determining whether the ALJ used the proper legal standards and found facts based upon the proper quantum of evidence.  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference as long as they are supported by substantial evidence.  Id. Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'"  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion."  Ortiz, 955 F.2d at 770.

Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence on the record. Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not the court, to resolve conflicts in the evidence. Id.

## IV.   **ANALYSIS**

Robar contends that the ALJ's residual functional capacity ("RFC") assessment that she retained the ability to do work at the light exertional level with certain other limitations was not supported by substantial evidence.  She also contends that the ALJ erred by not according controlling weight to Dr. Kelly's opinions and by giving little weight to the opinions of Dr. Feitelson and Jeanne Allen.  The Commissioner moves to affirm the decision. Because the weight given to the medical opinions could affect review of the ALJ's RFC assessment, I begin with that issue.

### A.   **Weight of Opinions**

A treatment provider's opinions will be given controlling weight if the "treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment(s) is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2).  When a treating source's opinion is not entitled to controlling weight, the ALJ determines the amount of weight based on factors that include the nature and extent of the source's relationship with the applicant, whether the source provided evidence in support of the opinion, whether the opinion is consistent with the record as a whole, and whether the source is a specialist in the field.  20 C.F.R. § 404.1527(d)(1-6). In addition, the ALJ must give reasons for the weight given to treating source opinions.  Id.; see also Soto-Cedeno v. Astrue, 380 Fed. Appx. 1-2 (1st Cir. 2010).

### 1. **Dr. Kelly's Opinions**

Dr. Kelly indicated on the questionnaire that Robar was limited to standing and walking for less than two hours, could sit for only two hours in an eight-hour work day, had to be able to change positions at will, and could lift ten pounds only occasionally and rarely lift twenty pounds.  Dr. Kelly also stated that Robar could use her fingers, hands, and arms only twenty-five percent of a work day and that she would miss four days of work each month.  The ALJ concluded that Dr. Kelly's opinion was entitled to little weight "as it is wholly inconsistent with the evidence on record."  (Tr. 15).  As examples,

the ALJ noted that Robar was able to "suit up" and skate with her hockey team during practices and that she was able to use a treadmill for ninety minutes at a time.

As Robar's medical records and her testimony about her activities demonstrate, Dr. Kelly's opinions are not supported by the evidence. Robar's treatment for orthopedic issues do not indicate any need to limit use of her hands, arms, and fingers in February of 2010.  In fact, the treatment note by Dr. Reeder at Integrated Orthopaedics, dated January 7, 2010, states:  "The patient denies any neck pain, numbness, tingling or weakness.  She states that her elbows are 'much better.'  She feels she is nearly done with physical therapy and is overall much improved." (Tr. 1102).  The medical treatment records show that Robar's last visit to Dr. Kelly's office, before February 2010, was in April 2009 for a rapid heartbeat, and the physician's assistant reported "no apparent distress" and "extremities appear normal."  Therefore, the ALJ correctly decided not to give Dr. Kelly's opinions about the severity of Robar's limitations controlling weight.  <u>See</u> 20 C.F.R. § 404.1527(d)(3)-(4).

**2.  <u>Jeanne Allen's Opinion and Dr. Feitelson's Opinion</u>**

Jeanne Allen and Dr. Feitelson gave opinions about the limiting effects of Robar's mental condition, which included an inability to meet competitive standards in a work environment and a likely absence

rate of four days each month.   The ALJ gave the opinions little weight because they were contradicted by the medical evidence that Robar's depression and anxiety were well controlled by medication.   The ALJ also noted that contrary to the opinions of Allen and Dr. Feitelson, Robar was able to coach an ice hockey team "which necessarily required maintaining attendance at practices, dealing with some stress, and remembering procedures, rules, drills, and plays." (Tr. 15).

As a licensed social worker, Jeanne Allen is not an acceptable medical source who can provide evidence to establish an applicant's impairment.   See 20 C.F.R. § 404.1513(a); see also Bliss v. Comm'r of Soc. Sec., 406 Fed. Appx. 541, 541-42 (2d Cir. 2011); McGee v. Astrue, 368 Fed. Appx. 825, 828 (9th Cir. 2010).   Therefore, the ALJ correctly discounted her opinion.

Although Robar cites to medical evidence that her depression and anxiety were not under control during the entire period between March 2007 and the hearing date, the record also includes substantial evidence that Robar's mental condition was controlled by medication, particularly as time progressed.   Further, Dr. Feitelson's more negative opinions are contradicted to some extent by her own GAF score assessment of 65.   The ALJ, not the court, is charged with resolving conflicts in the evidence.   Ortiz, 955 F.2d at 769. Because substantial evidence supports the ALJ's basis for giving Dr.

Feitelson's opinion little weight, that finding is entitled to
deference.

**B.    Residual Functional Capacity**

An individual's RFC is ordinarily that individual's "maximum
remaining ability to do sustained work activities in an ordinary
work setting on a regular and continuing basis," and any RFC
assessment "must include a discussion of the individual's abilities
on that basis."  SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996);
see also 20 C.F.R. § 404.1545.  In making that assessment, the ALJ
"will consider all of [the applicant's] medically determinable
impairments of which [the ALJ is] aware, including [the applicant's]
medically determinable impairments that are not 'severe' . . . ."
20 C.F.R. § 404.1545(a)(2).

The ALJ found that Robar retained the ability to do less than
a full range of light work, with limitations for certain climbing
activities, environmental factors, and simple instructions.  The
ALJ reviewed the medical evidence that supported his finding and
noted Robar's daily activities, which showed her ability to coach
hockey, work out at a gym, and assist with work around the house
and yard.  The evidence demonstrated, the ALJ found, that Robar had
more than enough energy to work full time.  Robar faults the ALJ's
assessment of her residual functional capacity because he relied

on the opinions of the state agency consultants, because other
evidence suggests greater limitations caused by medications and her
mental and physical health, and because her daily activities were
not as robust as the ALJ suggested.

Robar argues that the ALJ erred in giving controlling weight
to the opinions of the state agency consultants, Dr. Schneider and
Dr. Fairley, over the opinions of Dr. Kelly, Dr. Feitelson, and Jeanne
Allen.  Relying on Social Security Ruling 96-6p, Robar contends that
state agency consultants' opinions are not entitled to controlling
weight because they were not based on the entire record.[8]

> SSR 96-6p provides that state agency consultants' opinions

> can be given weight only insofar as they are supported
> by evidence in the case record, considering such factors
> as the supportability of the opinion in the evidence
> including any evidence received at the administrative law
> judge and Appeals Council levels that was not before the
> State agency, the consistency of the opinion with the
> record as a whole, including other medical opinions, and
> any explanation for the opinion provided by the . . .
> consultant.

SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1986).  In addition,
consultants' opinion "may be entitled to greater weight that the
opinions of treating or examining sources" in some circumstances,

---

[8] Dr. Schneider and Dr. Fairly reviewed the record and provided
their opinions in July 2007, several years before the hearing in
February 2010.

including but not limited to a situation when the opinion is based on a review of a more complete case record than what was available to the treating or examining source.  See id. at *3.

The ALJ gave the opinions of Dr. Schneider and Dr. Fairley "great weight" based a review of the entire record, which showed  that the opinions were "consistent with the totality of the medical evidence on record."  (Tr. 15).  Although Robar disagrees with that assessment, she has not shown what later medical evidence undermines the opinions of Dr. Fairley and Dr. Schneider.  The ALJ also relied on the opinion of Dr. Lauze in November 2008 when she opined in her treatment notes that Robar was cleared to drive and work and that she found no contraindications for Robar's employment, which are consistent with the consultants' opinions.

Finally, Robar contends that she was suffering from more fatigue than the ALJ took into consideration and notes that some of her medications could cause fatigue.  She also emphasizes her treatments for anemia.  The ALJ cites evidence that shows Robar's activities and medical treatment notes do not support the level of impairment Robar claims.  Although Robar points to evidence that suggests she was more limited by her impairments than the ALJ ultimately found, the record also includes substantial evidence to support the ALJ's RFC assessment.

## V.   CONCLUSION

The ALJ's decision is supported by substantial evidence in the record.   Therefore, I lack the authority to overturn it.   Plaintiff's motion for an order reversing the Commissioner's decision (Doc. No. 8) is denied.   The Commissioner's motion for an order affirming the decision (Doc. No. 9) is granted.

The clerk shall enter judgment accordingly and close the case. SO ORDERED.

                                        /s/Paul Barbadoro
                                        Paul Barbadoro
                                        United States District Judge

July  13, 2011

cc:  D. Lance Tillinghast, Esq.
     T. David Plourde, Esq.